UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States of America for Authorization to (a) Extend Interception of Wire Communications Occurring over the Cellular Telephone Initially Identified as 732-586-2198, and (b) Intercept Wire Communications Occurring over a Cellular Telephone Initially Identified as 929-303-0111, USAO Reference No. 2018R00774. | **Affidavit in Support of Application for Order Authorizing (a) Extended Interception of Wire Communications Over a Cellular Telephone, and (b) Initial Authorization to Intercept Wire Communications over a Cellular Telephone**<br><br>**Sealed** |

## Contents

I. Specifications ............................................................................................................... 3

    A. Affiant ............................................................................................................. 3

    B. Purpose of Affidavit ....................................................................................... 3

    C. Target Subjects. ............................................................................................... 4

    D. Target Offenses ............................................................................................... 4

    E. Objectives of the Interception ........................................................................ 5

    F. Target Cellphones and Service Provider ........................................................ 5

        1. Target Cellphones and Successor Target Cellphones Identifiers ................. 5

        2. Successor Service Provider ......................................................................... 7

        3. Application to Successor Target Cellphones and Successor Service Provider ............ 7

    G. Wire Communications Capabilities of Target Cellphone ............................... 7

    H. Background Conversations .............................................................................. 8

    I. Territorial Scope and Jurisdiction ................................................................... 8

    J. Period of Interception ...................................................................................... 8

    K. Monitoring Agents and Personnel .................................................................. 9

    L. Minimization of Wire Communications ......................................................... 9

    M. Prior Applications .......................................................................................... 10

II. The Investigation and Probable Cause ........................................................................ 11

    A. Probable Cause ............................................................................................... 11

    B. Basis and Scope of Declarations .................................................................... 12

    C. Details of the Investigation ............................................................................ 13

    D. Analysis of Communications Records for the Target Cellphones .................. 24

III. Normal Investigative Techniques ........................................................................... 25

    A. Insufficiency of Alternative Investigative Techniques .................................... 25

        1. Undercover Officers.................................................................................... 25

        2. Confidential Informants and Cooperating Witnesses .................................. 26

        3. Physical Surveillance ................................................................................ 28

        5. Geolocation Information ............................................................................ 30

        6. Telephone Records and Pen Registers ........................................................ 31

        8. Grand Jury Process ................................................................................... 32

        9. Search Warrants ........................................................................................ 33

        10. Arrests .................................................................................................... 34

        11. Trash Searches ........................................................................................ 35

        12. Prior Wiretaps ........................................................................................ 35

IV. Ancillary Investigative Orders............................................................................... 37

    A. Order to Service Provider .............................................................................. 37

        1. Technical Assistance to Accomplish the Interception .................................. 37

        2. Pen Register and Trap and Trace Information.............................................. 37

        3. Geolocation Information and Delayed Notice and Return ........................... 38

        4. Non-Disclosure ........................................................................................ 40

        5. Successor Service Provider........................................................................ 40

    B. Order for Expedited Provision of Information Concerning Communications Devices Related to the Interception .................................................................................... 40

V. Sealing.................................................................................................................... 41

2017.10.30

2

State of New York         )
County of New York      ) ss.:
Southern District of New York  )

NELSON PABON, a Task Force Officer with the Drug Enforcement Administration, being duly sworn, deposes and states:

## I.  Specifications

### A.  Affiant

I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7)—that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a Task Force Officer with the Drug Enforcement Administration ("DEA") for approximately five years. During that time, I have participated in investigations of unlawful drug trafficking and money laundering and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the "lingo" and coded language used by narcotics traffickers.

### B.  Purpose of Affidavit

I respectfully submit this Affidavit in support of the Application of Assistant United States Attorney Michael K. Krouse pursuant to the provisions of Chapter 119 of Title 18, United States

3

2017.10.30

Code ("Title III"), for an Order of Interception authorizing (1) the extended interception and recording of wire communications by the Target Subjects specified below over Target Cellphone-1 specified below, and (2) initial interception and recording of wire communications by the Target Subjects specified below over Target Cellphone-2 specified below (collectively, the "Target Cellphones"). I further submit this Affidavit in support of the Government's Application for ancillary orders and warrants (a) to the Service Provider, and any Successor Service Provider, for (i) necessary technical support to accomplish the interception, pursuant to 18 U.S.C. § 2518(4); (ii) pen register and trap and trace information for the Target Cellphones pursuant to 18 U.S.C. §§ 3121 *et seq.*; and (iii) geolocation information for the Target Cellphones, pursuant to Fed. R. Crim. P. 41, with delayed notification to the person affected pursuant to Rule 41(f)(3) & 18 U.S.C. § 3103a(b); and (b) to any wire communications service provider, pursuant to 18 U.S.C. § 2703(d) for expedited provision of subscriber, toll and service records for telephones and communications devices in communication with the Target Cellphones.

### C.  Target Subjects.

As also set forth in the Application, the Target Subjects whose communications are sought to be intercepted are: Adalberto VELAZQUEZ; Reinaldo ROMAN; Jamie GARCIA; Antonio BURGOS; Jose RIVERA, a/k/a "Monstro," Marilyn ANDINO; FNU LNU, a/k/a "Tone," and others unknown.

### D.  Target Offenses

As also set forth in the Application, the Target Offenses that are the subject of this Application, each of which is predicate offense under 18 U.S.C. § 2516, are: offenses involving

2017.10.30

USAO_001998

the distribution, and possession with intent to distribute, of controlled substances, to wit, heroin, fentanyl, and cocaine, the use of wire facilities to facilitate the same, the maintenance of drug-involved premises, conspiracy to do the same and attempts to do the same, in violation of 21 U.S.C. §§ 841, 843(b), 846, and 856.

### E.   Objectives of the Interception

As also set forth in the Application, the objectives of the interception sought herein are to reveal to the greatest extent possible: (i) the nature, extent and methods of the Target Subjects' commission of the Target Offenses; (ii) the identities of the Target Subjects, to the extent currently unknown, as well as their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the source, receipt, and distribution of contraband, and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance their illegal activities; (vii) the locations and disposition of the proceeds from and relating to those activities; and (viii) the location and other information necessary to seize and/or forfeit contraband, money and items of value, and other evidence of or proceeds of the commission of the Target Offenses. In addition, these interceptions are expected to constitute admissible evidence of the commission of the Target Offenses.

### F.   Target Cellphones and Service Provider

#### 1.   Target Cellphones and Successor Target Cellphones Identifiers

The current telephone number of Target Cellphone-1 is 732-586-2198.  Target Cellphone-1 appears to be a prepaid cellphone with no subscriber information.   Based on my participation in

5

2017.10.30

USAO_001999

this investigation, and as set forth below, I believe that Target Subject Adalberto VELAZQUEZ uses Target Cellphone-1. Service to Target Cellphone-1 is provided by AT&T. Target Cellphone-1 includes a removable SIM (Subscriber Information Module) card. The SIM card is a memory chip where certain information, such as subscriber information, is stored. Among the information stored on a SIM card is a serial number, somewhat the equivalent of a customer account number, called, variously, the International Mobile Subscriber Identity (or Identification or Identifier)—the IMSI number. The IMSI for Target Cellphone-1's SIM card is 310410041485340. At this time, the key identifier for Target Cellphone-1, and the means by which it will be identified to the Service Provider for installation of the intercept, is the telephone number.

The current telephone number of Target Cellphone-2 is 929-303-0111. Target Cellphone-2 appears to be a prepaid cellphone subscribed in the name of "Raymond Resto," 561 W. 141 Street, Apt. 105, New York, NY 10031. Based on my participation in this investigation, and as set forth below, I believe that Target Subject FNU LNU, a/k/a "Tone" uses Target Cellphone-2. Service to Target Cellphone-2 is provided by T-Mobile. Target Cellphone-2 includes a removable SIM (Subscriber Information Module) card. The SIM card is a memory chip where certain information, such as subscriber information, is stored. Among the information stored on a SIM card is a serial number, somewhat the equivalent of a customer account number, called, variously, the International Mobile Subscriber Identity (or Identification or Identifier)—the IMSI number. The IMSI for Target Cellphone-2's SIM card is 310260143043812. At this time, the key identifier for Target Cellphone-2, and the means by which it will be identified to the Service Provider for installation of the intercept, is the telephone number.

2017.10.30

USAO_002000

A user of cellphones like the Target Cellphones may switch the SIM card from one cellphone to another; may obtain a new SIM card (for example, a pre-paid card) for use with the same telephone number; or may request the service provider to port a new telephone number to the SIM card. It is to capture communications after certain such switches in customer service that authorization to intercept "Successor Target Cellphones" is also sought. By "Successor Target Cellphone" is meant (a) a cellphone with the same telephone number as one of the Target Cellphones, but where the SIM card's IMSI has changed; or (b) a cellphone with a new telephone number, but where the SIM card's IMSI remains the same.

### 2. Successor Service Provider

I know from the foregoing that the user of such a cellphone can switch the provider of service to that cellphone from one service provider to another service provider ("Successor Service Provider").

### 3. Application to Successor Target Cellphones and Successor Service Provider.

To avoid interruption in the execution of the Order of Interception, it is requested that the Order of Interception apply without further order of this Court to any Successor Target Cellphones, as well as to any Successor Service Provider for the Target Cellphones. Further, unless otherwise indicated, references herein to the "Target Cellphones" or "Service Provider" include any successors thereto.

### G. Wire Communications Capabilities of Target Cellphone

In addition to normal voice communications capabilities, the Service Providers for the Target Cellphones have advised us that the Target Cellphones have voicemail capabilities. It is

2017.10.30

USAO_002001

requested that the Order of Interception also apply to messages left to, and retrieved from, voicemail, that are otherwise subject to interception under Title III.

### H.  Background Conversations

It is common practice that individuals using cellphones frequently speak in the presence of and while personally communicating with other individuals on the subjects related to the cellphone communication. It is accordingly requested that the Order of Interception also apply to background conversations overheard over the Target Cellphones while the Target Cellphones are active or otherwise in use, that are otherwise subject to interception under Title III.

### I.  Territorial Scope and Jurisdiction

This Court has territorial jurisdiction to authorize the interception of wire communications sought in this application because, even if the Target Cellphones are used outside the Southern District of New York, all interceptions will automatically be routed to, and first heard and minimized, in the Southern District of New York.  In the event the Target Cellphones leave the United States during the period of interception, interceptions will continue to be routed to, and first heard and minimized in the Southern District of New York, to the extent the Target Cellphones' communications continue to be transmitted via the Service Provider's system.

### J.  Period of Interception

As set forth in the Application, the DEA will execute the Order of Interception as soon as practicable after it is signed. Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that authorization to intercept not automatically terminate when the first communication described

8

2017.10.30

herein has been obtained, but rather continue until the Objectives of the Interception are fully achieved, or for a period of thirty (30) days, whichever is earlier. As to Target Cellphone-1, the thirty days are measured from the date the Order of Interception is signed. As to Target Cellphone-2, the thirty days are measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under the Order of Interception, or ten days from the date of that Order.

### K. Monitoring Agents and Personnel

Consistent with 18 U.S.C. § 2518(5), the interceptions for which authorization is sought will be conducted only by Government personnel, and by individuals operating under a contract with the Government under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

### L. Minimization of Wire Communications

Consistent with 18 U.S.C. § 2518(5), monitoring agents and personnel will conduct the interception in such a way as to minimize the interception of wire communications not otherwise subject to interception under Title III. Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Title III. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the Target Subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If a conversation has been minimized, the monitoring agents will spot check to ensure that the

9

USAO_002003

conversation has not turned to criminal matters. In the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization will be accomplished as soon as practicable after such interception.   Special attention shall be given to minimize all privileged communications.  Monitoring agents and personnel will also operate under specific Minimization Instructions provided by the Assistant United States Attorney supervising the interception.

### M.  Prior Applications

I have been informed that reviews of the electronic surveillance files were conducted for the Drug Enforcement Administration on November 27, 2018; the Federal Bureau of Investigation on November 27, 2018; and United States Immigration and Customs Enforcement on November 27, 2018; and that those reviews revealed no prior applications for Court authorization to intercept wire, oral, or electronic communications involving the Target Cellphones, the Target Subjects, or the places named herein, except as follows:

On or about October 18, 2018, the Honorable Colleen McMahon of the U.S. District Court for the Southern District of New York signed an Order of Interception (the "October 18 Order") authorizing the interception of wire communications over a cellular phone believed to be used by Reinaldo ROMAN and identified by phone number 646-659-7129 (the "ROMAN Phone"). Interception pursuant to the October 18 Order began on or about the next day, October 19, 2018. The interceptions over the ROMAN Phone ended on November 17, 2018.  The target subjects of the October 18 Order included Adalberto VELAZQUEZ; Reinaldo ROMAN; Jamie GARCIA;

10

USAO_002004

Antonio BURGOS; and others unknown.   Communications were intercepted between VELAZQUEZ and ROMAN, among others, regarding narcotics activity.

On or about November 1, 2018, the Honorable Robert W. Sweet of the U.S. District Court for the Southern District of New York signed an Order of Interception (the "November 1 Order") authorizing the interception of wire communications over Target Cellphone-1.   Interception pursuant to the November 1 Order began on or about the next day, November 2, 2018.   The interceptions over Target Cellphone-1 are scheduled to end on December 1, 2018.   The target subjects of the November 1 Order included Adalberto VELAZQUEZ; Reinaldo ROMAN; Jamie GARCIA; Antonio BURGOS; Jose RIVERA, a/k/a "Monstro," and others unknown. Communications have been intercepted between VELAZQUEZ and ROMAN, RIVERA, and "Tone," among others, regarding narcotics activity.

## II.   The Investigation and Probable Cause

### A.   Probable Cause

For the reasons set out in this affidavit, I respectfully submit that there is probable cause to believe that one or more of the Target Subjects have committed, are currently committing, and will continue for at least the next 30 days to commit one or more of the Target Offenses; that one or more of the Target Subjects, during the period of interception sought, will use the Target Cellphones in furtherance of, in connection with, to facilitate, to accomplish, and to commit the Target Offenses specified herein; that additional communications of the same type will occur during the period of interception requested; and that the interception sought herein will achieve the Objectives of the Interception.

11

2017.10.30

### B.  Basis and Scope of Declarations

This case is being investigated by the DEA.  I have personally participated in the investigation and I make this affidavit based on my personal participation in this investigation, and based on reports made to me by DEA agents, analysts, and other law enforcement authorities. The technical information set forth herein is additionally based on agency training, review of agency and industry technical publications, information obtained from service providers, and review of other wiretap applications. Except where otherwise noted or the context otherwise makes clear, (i) the information set forth in this affidavit may include information provided to me by other law enforcement agents who have assisted in the investigation; (ii) wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed; (iii) such statements are reported in substance and in part; (iv) where I refer to the contents of previously recorded conversations (*e.g.,* consensual recordings or prior wiretap interceptions), my quotations and descriptions are based on preliminary draft transcripts and/or translations of those conversations; and (v) information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance. Further, because this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date.  Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued.  Nor do I request that this Court rely on any

12

2017.10.30

facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications.

## C.  Details of the Investigation

Since in or about 2017, the DEA has been investigating a drug trafficking organization ("DTO") that is distributing large quantities of fentanyl-laced heroin out of auto body shops located in the Bronx.  One of the auto body shops is owned by Target Subject Adalberto VELAZQUEZ, the user of Target Cellphone-1, and is located at 1125 Whitlock Avenue in the Bronx ("Auto Body Shop-1").   According to a confidential source ("CS-1"),[1] from in or about 2013 until in or about April 2017, VELAZQUEZ and several other dealers used Auto Body Shop-1 to traffic in narcotics, including heroin mixed with fentanyl.  CS-1 stated that from 2013 until April 2017, CS-1 obtained approximately 100 bundles, or approximately 100 grams, of heroin approximately every 10 days from VELAZQUEZ.  CS-1 also stated that VELAZQUEZ had several individuals working on his behalf to distribute narcotics, including an individual that CS-1 identified as "Monster" or "Monstro."

On or about December 12, 2017, an NYPD undercover officer (the "UC") met with Target Subject Antonio BURGOS.  BURGOS placed a telephone call to "Jimmy," who was later identified as Target Subject Jaime GARCIA.  The UC and BURGOS then traveled by car to Auto

---

[1] CS-1 has pleaded guilty to narcotics offenses in the Southern District of New York, and is providing information in the hopes of a more lenient sentence.  CS-1 has five prior felony convictions, including for criminal possession of stolen property in 2006, criminal sale of a controlled substance in 1995, attempted criminal sale of a controlled substance in 1991, criminal possession of a controlled substance in 1991, and attempted robbery in 1983.  CS-1's information has been deemed reliable and has sometimes been corroborated by independent evidence.

2017.10.30

USAO_002007

Body Shop-1. The UC gave BURGOS $300 and BURGOS then went inside Auto Body Shop-1. When BURGOS exited Auto Body Shop-1, BURGOS handed the UC 50 glassines of heroin stamped with the word "scorpion." The glassines later tested positive for fentanyl and heroin.

On or about January 9, 2018, the UC met with BURGOS again. The UC stated that BURGOS called GARCIA and told GARCIA that BURGOS was on his way to see him. The UC and BURGOS then traveled by car to Auto Body Shop-1. The UC gave BURGOS $300, and BURGOS went into Auto Body Shop-1. When BURGOS came out of Auto Body Shop-1, BURGOS handed the UC 50 glassines of heroin stamped with the word "scorpion." The glassines later tested positive for fentanyl and heroin.

On or about March 28, 2018, the UC purchased from BURGOS another 150 glassines of heroin stamped with the word scorpion for $900. This meeting was arranged by the UC speaking to BURGOS over the BURGOS Phone. During this controlled purchase, the UC met BURGOS's supplier, who was identified as the Target Subject Reinaldo ROMAN. At the meeting, ROMAN instructed the UC to contact him directly instead of continuing to purchase drugs from BURGOS.

On or about April 10, 2018, the UC arranged to meet ROMAN in the vicinity of 804 East 138th Street in the Bronx. When ROMAN arrived at that location, he entered the UC's vehicle and sold the UC 600 glassines of heroin for $3,000. The glassines later tested positive for fentanyl and heroin.

On or about April 23, 2018, the UC arranged to meet ROMAN at a gas station in the Bronx. When ROMAN arrived, he told the UC to follow him to the vicinity of 328 Throgs Neck

14

2017.10.30

Expressway in the Bronx.  ROMAN then sold the UC 600 glassines of heroin for $3,000.  The glassines later tested positive for fentanyl and heroin.

On or about May 16, 2018, ROMAN called the UC.  During this conversation, ROMAN stated, in substance and in part, that the phone he was using was his new phone number, 646-659-7129—*i.e.*, the ROMAN Phone—and that the other one is "no good."  The UC stated, in substance and in part, that he was looking for the same amount as he previously purchased.  ROMAN stated, in substance and in part, that he was "dry," and that he would call the UC "when we up and working."  Based on my training and experience, it appears that ROMAN was telling the UC on this call that he had a new phone number, and that he was currently out of narcotics to sell, but that he would call the UC later once he had a new supply of narcotics.

On or about June 6, 2018, the UC contacted ROMAN on the ROMAN Phone in order to arrange a meeting.  ROMAN and the UC met in the vicinity of Story and Fteley Avenues in the Bronx, and ROMAN sold the UC 600 glassines of heroin for $3,000.  The glassines later tested positive for fentanyl and heroin.

In or about June 2018, a cooperating source ("CS-2"),[2] provided me with the phone number for Target Cellphone-1, and stated that Adalberto VELAZQUEZ, a Target Subject of this investigation from whom CS-1 regularly obtained heroin between 2013 and April 2017, and who owned and operated Auto Body Shop-1, was using Target Cellphone-1.  CS-2 informed law enforcement, in or about June 2018, that VELEZQUEZ continues to distribute heroin.

---

[2] CS-2 is a paid cooperating source for the DEA.  CS-2's information has been deemed reliable and sometimes has been corroborated by independent evidence.

15

USAO_002009

As stated above, on or about October 18, 2018, the Honorable Colleen McMahon, Chief United States District Judge for the Southern District of New York, authorized the interception of wire communications over the ROMAN Phone.  On or about October 19, 2018, law enforcement began intercepting wire communications over the ROMAN phone.

On or about October 24, 2018, at approximately 10:01 a.m., VELAZQUEZ used Target Cellphone-1 to call the ROMAN Phone.  The call was intercepted and I have reviewed the recording and a draft transcript of the call.  The following is a portion of the conversation that took place over Target Cellphone-1:

**VELAZQUEZ:**  Listen, are you finishing? I'm working.

**ROMAN:**  But I finished already. I had the money to give it to you and this thing happened to me, brother.

**VELAZQUEZ:**  Oh man! And those people are waiting for me, buddy. What are we going to do now?

**ROMAN:**  I have 1500 pesos for you.

**VELAZQUEZ:**  I don't dare to go to those people with 1500 pesos. Are you crazy?

**ROMAN:**  But buddy, I don't know what to do.

**VELAZQUEZ:**  Fuck, man.

**ROMAN:**  You get it [Unintelligible]. What can I do?

. . .

**VELAZQUEZ:**  Yeah. Anyway, we'll talk tomorrow then.

**ROMAN:**  Alright. So look, I already finished.

**VELAZQUEZ:**  Damn, man. And those people are calling me. I've been calling you to ask you and look now.

16

2017.10.30

**ROMAN:**       My phone was in the car. You know what? The thing is that the guy owed me money. And I was fed up with all the bullshit; and I slapped him in front of many people and he got embarrassed, so he called the police on me. I was sitting in the car. The police came with all their guns. That scared me a lot. With their guns drawn; and supposedly I was in the car with a gun. They checked, and they found a bundle on top so you already know. They charged me with possession. And since I had a long record, and even a bible can be written (with all the records.)

**VELAZQUEZ:**   I have a fucking thing here, and it's driving me crazy.

**ROMAN:**       Well, I'm dry. People are calling me and I just let the phone rings because what will I tell them?

**VELAZQUEZ:**   So come home then so you can grab 20 upfront.

**ROMAN:**       When? Now?

**VELAZQUEZ:**   Soon, when I finish. Be on the alert so that when I get out, you can grab them.

Based on my training and experience, my knowledge of this case, and the context of this call, it appears that VELAZQUEZ is continuing to supply narcotics to ROMAN, and that ROMAN owes VELAZQUEZ money. ROMAN tells VELAZQUEZ that he has "1500 pesos," which, based on my training and experience, is code for $1,500. VELAZQUEZ appears to say that he cannot go to his suppliers with such a small amount of money. ROMAN then states that he was arrested with a "bundle," which I understand, based on my training and experience, to mean a bundle of heroin—*i.e.*, 10 glassines of heroin. ROMAN then tells VELAZQUEZ that he is "dry," which, based on my training and experience, I understand to mean that ROMAN no longer has narcotics to sell. In response, VELAZQUEZ tells ROMAN to "come home" so that he can grab "20 upfront." Based on my training and experience, and my participation in this investigation, it appears that VELAZQUEZ is offering to supply ROMAN with a quantity of narcotics on consignment.

17

2017.10.30

After intercepting this call, I performed physical surveillance on ROMAN's residence. I observed ROMAN leave his residence and drive to a location that, based on my previous surveillance, I have learned is VELAZQUEZ's residence. I saw ROMAN enter VELAZQUEZ's residence empty-handed. When ROMAN left VELAZQUEZ's residence a short time later, ROMAN was carrying what appeared to be a small package in a weighted plastic bag. Based on the intercepted call above, I believe that the plastic bag contained a quantity of narcotics.

As stated above, on or about November 1, 2018, the Honorable Robert W. Sweet, United States District Judge for the Southern District of New York, authorized the interception of wire communications over Target Cellphone-1. On or about November 2, 2018, law enforcement began intercepting wire communications over Target Cellphone-1.

On or about November 6, 2018, at approximately 3:13 p.m., a call was intercepted over Target Cellphone-1 with an unknown individual using Target Cellphone-2. Based on previous intercepted calls, it appears that this unknown individual who is using Target Cellphone-2 goes by the name "Tone." The following is a portion of the conversation that took place between VELAZQUEZ and "Tone":

> **TONE:** Listen, my fat friend from across the street is calling me, you heard? He's calling me. He's been calling me two days now.
>
> **VELAZQUEZ:** Listen, as soon as they bring that to me, I'll pass it to you. Because this one was calling me also, to grab some as well. I don't even know what to do.
>
> **TONE:** Who? The small guy?
>
> **VELAZQUEZ:** The young kid. Of course.
>
> **TONE:** Bro, the young kid, I spoke to him already. I don't know why he's call…he called you again?

18

2017.10.30

**VELAZQUEZ:**   He called me yesterday.

**TONE:**        He called you yesterday because he thought he was going to get locked up.  He's waiting, they're going to violate him.  They're going to give him 90 days.

**VELAZQUEZ:**   Damn.

Based on my training and experience, my participation in this investigation, and the context of the call, it appears that "Tone" is one of VELAZQUEZ's suppliers for narcotics.  Tone appears to state that his boss ("my fat friend") is calling him, and VELAZQUEZ assures Tone that "as soon as they bring that to me, I'll pass it to you"—as in, the money that is owed.  VELAZQUEZ also mentions that another individual, "the young kid," was calling to also "grab some as well"—as in, some of the money.  The young kid wanted the money because, "he thought he was going to get locked up."

On or about November 8, 2018, at approximately 6:24 p.m., another call was intercepted over Target Cellphone-1 between VELAZQUEZ and "Tone," who was again using Target Cellphone-2.  That call included the following conversation:

**TONE:**        Listen, I have to bring a picture of someone.  You hear?

**VELAZQUEZ:**   Mmm.

**TONE:**        Huh?

**VELAZQUEZ:**   Well, alright.

**TONE:**        I'll pass.  I'll pass by there.  Did the guy pay the rent, yet?

**VELAZQUEZ:**   Tomorrow, I think.

**TONE:**        Okay, alright.  But I have to pass you a really nice picture.  Okay?

2017.10.30

USAO_002013

**VELAZQUEZ:**   Alright, tomorrow.  We'll see each other tomorrow.

Based on my training and experience, my participation in this investigation, and the context of the call, a "picture" is a common code for a sample of narcotics.  Therefore, it appears that "Tone" is telling VELAZQUEZ that he wants to stop by to provide him a sample of narcotics. "Tone" also asked if the "guy pa[id] the rent yet"—meaning, whether VELAZQUEZ's customer paid for the narcotics that VELAZQUEZ supplied.

On or about November 12, 2018, at approximately 1:39 p.m., another call was intercepted between VELAZQUEZ, using Target Cellphone-1, and an female caller who was later identified as Marilyn ANDINO ("ANDINO").  That call included the following conversation:

> **ANDINO:**   You have me in this mess for three days.  Look, they are waiting for me.
>
> **VELAZQUEZ:**   Take it easy, I am taking it to you now for sure.  What happened was, what was there was no good, and the thing I fixed it, for sure I am taking that to you shortly.
>
> **ANDINO:**   Alright.
>
> **VELAZQUEZ:**   For sure I am seeing you shortly.
>
> **ANDINO:**   It's that these people are waiting.

Based on my training and experience, my participation in this investigation, and the context of the call, it appears that VELAZQUEZ supplies ANDINO with narcotics.  VELAZQUEZ is telling ANDINO that the narcotics he had were no good, and that he fixed them, so he would be bringing her the narcotics "shortly."  Later that day, at 2:45 p.m., the VELAZQUEZ told ANDINO over an intercepted call that he was on his way, and the ANDINO said that she would be sending

20

USAO_002014

her son down to meet VELAZQUEZ. On this call, the UF described her son as "tall, slim, and bald."

After intercepting this call, I and other law enforcement agents performed physical surveillance on VELAZQUEZ. I observed VELAZQUEZ arrive by car at a building located at 1106 W. Farms Road, in the Bronx. VELAZQUEZ handed an object to an individual, who matched the description of the UF's son, and who was later identified as Angel MARTINEZ. After VELAZQUEZ left, I and other agents stopped and arrested MARTINEZ, and seized a box containing what appeared to be ten bundles (100 glassines), and two loose glassines of a substance that appeared to be narcotics. Based on my training and experience, it appears that the substance provided by VELAZQUEZ, and seized from MARTINEZ, is heroin.

On or about November 14, 2018, at approximately 3:55 p.m., another call was intercepted between VELAZQUEZ, using Target Cellphone-1, and "Tone," using Target Cellphone-2. That call included the following conversation:

> **TONE:** Listen. So talk to me. What about this dude Jose? I asked him about that and he was telling some story, brother.
>
> **VELAZQUEZ:** Why, why, why?
>
> **TONE:** About the 100 pesos that I lent him.
>
> **VELAZQUEZ:** To Jose?
>
> **TONE:** Yes, remember it was 100?
>
> **VELAZQUEZ:** Yes, it was 200 pesos. I took 100 pesos and he took 100 pesos.
>
> **TONE:** Yes, I know. He is . . .
>
> **VELAZQUEZ:** You have to put that on his account, put it on his account.

21

USAO_002015

**TONE:**       Yes, but is that I have to give that money to the dude.

**VELAZQUEZ:**   Yes, to somebody else.  I understand you, I understand you.

**TONE:**       That's not mine and then…

**VELAZQUEZ:**   The guy who is coming to see me now.  I'll give that to you, because I already gave five pesos to the kid.  He came.

**TONE:**       Who, the kid?

**VELAZQUEZ:**   Yes.

**TONE:**       This guy is . . .

**VELAZQUEZ:**   I got rid of him already.  It has been three times that I have to come down to give it to him.

**TONE:**       Of what, five?

**VELAZQUEZ:**   Of five.  First it was 5,800 pesos.  Do you remember?

**TONE:**       Yes.

**VELAZQUEZ:**   Uh-huh.  The first one was five, another one for 5,800 and five now. We just owe him a little bit now.  So, this one.  I'll give you this one now.

**TONE:**       Damn man, I have to give to this people, they . . .

**VELAZQUEZ:**   Yes, I have.  Yes, but you know the kid was driving me crazy.

**TONE:**       No, I know.  That's why I said, "That faggot can go and fuck himself."

**VELAZQUEZ:**   No, now, the other thing.

**TONE:**       Because of him we had bad luck with that shit.

**VELAZQUEZ:**   I'm stuck right now, man.

**TONE:**       Yes, but the one who loaned me the 200 pesos, that's . . . I need that guy.

**VELAZQUEZ:**   Yes, yes.

22

2017.10.30

**TONE:**      You understand me?

. . .

**TONE:**      Listen, when are they paying you the rent?

**VELAZQUEZ:**   I don't know. I told him around these days . . . the quicker the better. That's for you.

**TONE:**      Yes. No, that's not for me, that's for the guy, you heard?

. . .

**TONE:**      That's for the guy, it's not for me.

**VELAZQUEZ:**   Um, okay, don't worry then. As soon as I get it, I'll give it to you.

Based on my training and experience, my participation in this investigation, and the context of the call, it again appears that "Tone" is one of VELAZQUEZ's suppliers for narcotics. "Tone" appears to state that his supplier or boss wants to get paid for narcotics, and VELAZQUEZ assures "Tone" that "[a]s soon as I get it, I'll give it to you"—as in, the money that VELAZQUEZ owes to "Tone" for the product that "Tone" provided him.

On or about November 26, 2018, at approximately 12:07 p.m., VELAZQUEZ used Target Cellphone-1 to call the ROMAN Phone. The call was intercepted and I have reviewed the recording and a draft transcript of the call. The following is a portion of the conversation that took place over Target Cellphone-1:

**VELAZQUEZ:**   How are you?

**ROMAN:**      Very good, very good. I have a question. Of the pieces that you gave me, how many pieces were they?

**VELAZQUEZ:**   60 and 25?

23

USAO_002017

| ROMAN: | Uh-huh, 85, okay. |
| VELAZQUEZ: | Uh-huh. |
| ROMAN: | Alright, so what's missing?  It's 15…35 more. |
| VELAZQUEZ: | Yes. |
| ROMAN: | Okay, alright. |
| VELAZQUEZ: | They're there. |
| ROMAN: | Just making sure.. |

Based on my training and experience, my knowledge of this case, and the context of this call, it appears that ROMAN is asking how many bundles of heroin VELAZQUEZ provided him ("how many pieces"), and VELAZQUEZ answered 60 and 25, for a total of 85.

Based on the foregoing, it appears that Target Cellphone-1 is in Adalberto VELAZQUEZ's possession and that VELAZQUEZ is continuing to distribute narcotics to ROMAN and others. Further, it appears that Target Cellphone-2 is in the possession of FNU LNU, a/k/a "Tone," and that "Tone" is supplying narcotics to VELAZQUEZ. I believe that Order of Interception will lead to further information about the location and identity of the Target Subjects, including other suppliers to VELAZQUEZ and "Tone," and of the narcotics that they are seeking to sell. Moreover, I submit that there is probable cause to believe that the Order of Interception will lead to evidence, contraband, fruits, and property otherwise connected to the Target Subjects' involvement in the sale of narcotics.

### D.  Analysis of Communications Records for the Target Cellphones

I have analyzed the toll records for Target Cellphone-2, including specifically records from on or about October 21, 2018 up to on or about November 24, 2018.

2017.10.30

USAO_002018

Based on my review of those records, I have learned, among other things, that, during the time period for which toll records were reviewed, Target Cellphone-2 called phone number 347-918-1756 (the "1756 Phone") approximately 50 times, most recently on November 24, 2018. Based on my review of business records associated with the 1756 Phone, the 1756 Phone is subscribed to Target Subject JOSE RIVERA. According to CS-2, JOSE RIVERA, who CS-2 knows as "Monstro," works for VELAZQUEZ making drug deliveries. As stated above, CS-1 previously informed me that an individual who CS-1 knew as "Monster" or "Monstro" worked with VELAZQUEZ.

## III.  Normal Investigative Techniques

### A.  Insufficiency of Alternative Investigative Techniques

Consistent with 18 U.S.C. § 2518(3)(c), I respectfully submit that, for the reasons discussed below, normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to achieve the Objectives of the Interception herein sought.

#### 1.  Undercover Officers

As described above, the investigation to date has made use of an undercover agent (the "UC"), and the UC has significantly furthered the objectives of the investigation. In particular, the UC has made multiple controlled purchases of fentanyl-laced heroin from Target Subjects Antonio BURGOS and Reinaldo ROMAN, and has placed recorded phone calls to ROMAN in which ROMAN discusses the pricing for narcotics. Despite the value that the UC has brought to the investigation to date, however, there is no expectation that undercover agents such as the UC

25

2017.10.30

will be able to ascertain the full scope of the illegal activities of the Target Subjects. Large-scale drug trafficking organizations are highly compartmentalized, and it is not plausible to expect that the activities of undercover agents will result in law enforcement learning about the full scope of these organizations' operations. Here, for example, the UC has been able to make purchases from ROMAN, but has not yet made purchases from other members of the DTO—in particular higher-ranked members of the DTO, like Adalberto VELAZQUEZ, the user of Target Cellphone-1. It is unlikely that an undercover agent will get any access to members of the organization with whom he does not need to interact for purposes of a specific narcotics transaction.

I am also aware that attempting to introduce an undercover agent into a DTO inherently comes with risks for the agent, particularly if any of the Target Subjects or members of the DTO suspect that he or she may be a law enforcement officer. It is very possible that attempting to introduce an additional undercover agent into the DTO may place that person in danger without promising any significant investigatory advantage.

## 2. Confidential Informants and Cooperating Witnesses

As discussed above, the DEA has used two confidential sources, CS-1 and CS-2, to further the Objectives of Interception. CS-1 provided important information about the scope of the DTO and how it operated, including by identifying Auto Body Shop-1 as a place where illegal drug activity was occurring, and by identifying Target Subject Adalberto VELAZQUEZ as a high-level supplier of heroin. CS-2 provided information about the new phone number being used by VELAZQUEZ and the phone number being used by Jose RIVERA, a/k/a "Monstro." The confidential sources have furthered the goals of the investigation. However, neither of the

26

USAO_002020

confidential sources has access to all members of the DTO or even all the Target Subjects. The insular nature of the DTO has made it difficult for them to obtain additional points of contact to further infiltrate the DTO.

One of the goals of this investigation is to identify, as broadly as possible, the Target Subjects' associates and co-conspirators and the scope of their activities. Based on my training and experience, and consistent with the statements of all the confidential sources used in this investigation, narcotics traffickers are highly reticent about meeting with unknown persons, or discussing the full scope of their activities with outsiders to their conspiracy or with individuals who are newly introduced as potential co-conspirators. Members of the DTO are much more likely to discuss the nature, extent, and methods of the operation of the DTO in conversations with each other than in conversations with outsiders or individuals who are newly introduced as potential coconspirators.

I am currently unaware of any other cooperating witness, confidential source, or likely confidential source, who has information that could accomplish all of the Objectives of the Interception. Nevertheless, we continue to look for opportunities to develop additional cooperating witnesses and confidential sources. If the opportunity were to arise, agents would de-brief persons involved to determine, what, if any, information they had about the Target Subjects and the drug-trafficking activities of their associates. In addition, investigators have indexed in law enforcement databases certain information, such as relevant persons, vehicles, locations, and phone numbers, in case other investigations (or confidential sources or cooperating witnesses) that

2017.10.30

USAO_002021

intersect with our case.  However, thus far, we have not developed other human sources of information who are in a position to materially aid the investigation.

In sum, the use of confidential sources or cooperating witnesses alone will not allow law enforcement to determine the full scope of the Target Subjects' operations, including the sources of their narcotics, their customers, their methods of transporting narcotics, the times of transportation, the locations where narcotics, assets, and proceeds are stored, and how proceeds are transported.

### 3. Physical Surveillance

As described above, I and other law enforcement officers have conducted extensive surveillance of members of the DTO—in particular, Target Subjects Reinaldo ROMAN and Adalberto VELAZQUEZ—since this investigation began in December 2017, including after interceptions began over the ROMAN Phone.  Physical surveillance, however, is insufficient to achieve the Objectives of Interception for several reasons.  Most importantly, it appears that DTO members typically engage in narcotics activity indoors, including within auto body shops owned by Adalberto VELAZQUEZ and other members of the DTO, and within homes, where agents cannot surveil them.  For example, as stated above, after intercepting a call where it appeared VELAZQUEZ was going to provide narcotics to ROMAN, I performed physical surveillance and observed ROMAN enter VELAZQUEZ's residence empty-handed and then exit VELAZQUEZ's residence a short time later with what appeared to be a small package in a weighted plastic bag. Because this exchange happened indoors, however, I was not able to confirm that ROMAN received narcotics from VELAZQUEZ.  Therefore, although law enforcement officers have tried

28

2017.10.30

to conduct physical surveillance of DTO members, such surveillance and monitoring is not a reasonable alternative to intercepting wire communications. As discussed above, for example, VELAZQUEZ uses, or is expected to use, Target Cellphone-1, and "Tone" uses, or is expected to use, Target Cellphone-2, to communicate regarding the Target Offenses, and these communications are not amenable to physical surveillance. Thus, through physical surveillance, we have not been able to fully identify the individuals participating in the Target Offenses, including "Tone," the user of Target Cellphone-2.

Finally, generally speaking, physical surveillance in and of itself is useful mainly in generating information concerning the identity of an individual, where he or she resides, location he or she frequents, and the identities of the persons with whom he or she meets. However, it provides limited direct evidence of the significance of the meetings. When used in conjunction with wire interception, however, physical surveillance has proved to be a useful investigative technique. It is expected that the information that can be obtained from the interception of communications over the Target Cellphones will help law enforcement locate the identified Target Subjects and to identify additional Target Subjects, thereby enhancing the prospects for fruitful physical surveillance. In addition, with the knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location or that proceeds or narcotics will travel over a certain route, it may be possible to establish physical surveillance at that location or on that route in advance, thus minimizing the risks of discovery inherent in following Target Subjects or remaining at targeted locations for extended periods of time.

29

2017.10.30

### 5. Geolocation Information

The DEA has obtained the following judicial orders (the "Geolocation Orders") authorizing agents to obtain geolocation information for certain of the Target Subjects: on or about January 16, 2018, the Honorable Henry B. Pitman, United States Magistrate Judge for the Southern District of New York, issued a warrant for cellphone location information associated with phone number 917-443-5128, believed to belong to Target Subject Antonio BURGOS; on or about April 26, 2018, the Honorable Ona T. Wang, United States Magistrate Judge for the Southern District of New York, issued search warrants for the use of a tracking device on two vehicles—one believed to be used by Target Subject Adalberto VELAZQUEZ and one believed to be used by Target Subject Reinaldo ROMAN; on or about May 17, 2018, the Honorable Barbara C. Moses, United States Magistrate Judge for the Southern District of New York, issued a warrant for cellphone location information associated with phone number 646-659-7129, believed to belong to Target Subject Reinaldo ROMAN; on or about July 17, 2018, the Honorable Debra Freeman, United States Magistrate Judge for the Southern District of New York, issued warrants for cellphone location information associated with phone number 787-975-4176, believed to belong to Target Subject Adalberto VELAZQUEZ, and phone number 646-659-7129, believed to belong to Target Subject Reinaldo ROMAN; on or about July 17, 2018, the Honorable Debra Freeman, United States Magistrate Judge for the Southern District of New York, issued search warrants for the use of a tracking device on two vehicles—one believed to be used by Target Subject Adalberto VELAZQUEZ and one believed to be used by Target Subject Reinaldo ROMAN; and on or about November 20, 2018, the Honorable Henry B. Pitman, United States Magistrate Judge for the

30

USAO_002024

Southern District of New York, issued a warrant for cellphone location information associated with phone number 929-303-0111—*i.e.*, Target Cellphone-2—believed to belong to Target Subject FNU LNU, a/k/a "Tone."

The Geolocation orders have furthered the objectives of the investigation, by, for example, assisting agents in identifying Target Subjects and the places the Target Subjects go to engage in the Target Offenses. However, for reasons similar to those discussed above with respect to physical surveillance, geolocation information is not a reasonable alternative to intercepting wire communications. While geolocation information can provide valuable information regarding the location of meetings and where the Target Subjects go before and after they meet with one another or other individuals, the geolocation information is unable to provide information on any unknown person or persons who are meeting with the Target Subjects or the precise nature of the meetings, nor help law enforcement differentiate which locations are visited for innocuous reasons and which are visited in connection with criminal activities. For example, the DTO appears to use the legitimate businesses, such as Auto Body Shop-1, to further the DTO's illegal narcotics activity, making it difficult to determine whether members of the DTO are engaged in legitimate or illegal activity when they are in those locations. Accordingly, geolocation information without accompanying interception, will not enable agents to achieve all of the Objectives of the Investigation.

### 6. Telephone Records and Pen Registers

In connection with this investigation, agents have used subpoenas and court orders to obtain records of voice and electronic communications occurring over the Target Cellphones, as

31

2017.10.30

well as other phones that have been in contact with the Target Cellphones. However, telephone records provide only limited information. These methods will not enable law enforcement to identify with certainty the persons involved in committing the Target Offenses, nor will they reveal the extent and nature of the activities of the DTO. Furthermore, the use of calling cards and telephone access numbers often hides the ultimate numbers called, thereby preventing law enforcement from learning to whom a Target Subject is speaking.

Moreover, I know from my training and experience that the use of fictitious subscriber information is a common practice of narcotics traffickers used to prevent law enforcement from immediately obtaining their identities. Furthermore, toll records, unlike the interceptions requested herein, do not provide real time evidence of the content of communications, which is an essential tool not only in providing opportunities to identify the DTO's members and interdict its activities, but also to be used as evidence of the commission of those activities. It is only through the combination of wire and electronic surveillance, visual surveillance, and other investigative tools that we expect to identify fully the nature and scope of the DTO.

### 8. Grand Jury Process

The use of grand jury subpoenas does not at this time appear to be a viable means to achieve the Objectives of the Interception. The issuance of grand jury subpoenas to targets of the investigation at this stage would be counterproductive. The issuance of a grand jury subpoena would tip off the recipient of the subpoena as to the existence of the investigation. The recipient of the subpoena would likely inform his/her criminal associates, thereby making the targets conscious of law enforcement and more likely to change their present habits and methods to avert

2017.10.30

USAO_002026

further law enforcement detection. If the recipient of a grand jury subpoena chose to testify, the need to immunize such a witness, who would most likely be a lower-level member of the DTO, could make later use of the witness at trial against his/her supervisors more difficult because the incentive to assist law enforcement would be diminished in the absence of charges and a possible prison sentence for failure to provide complete and truthful information.

### 9. Search Warrants

On or about May 10, 2018, the Honorable Gabriel W. Gorenstein, United States Magistrate Judge for the Southern District of New York, issued a warrant to search an auto body shop located at 1432 Blondell Avenue in the Bronx ("Auto Body Shop-2"). The search warrant was obtained after a 911 caller stated that individuals armed with guns were inside Auto Body Shop-2 packaging narcotics, and after responding, NYPD officers observed individuals throwing what appeared to be narcotics over a fence in order to evade detection. The narcotics recovered around the premises of Auto Body Shop-2 and inside Auto Body Shop-2 totaled approximately one kilogram of cocaine, 746 grams of heroin, and 224 grams of marijuana. A gun was also recovered inside Auto Body Shop-2. Three individuals were found inside Auto Body Shop-2 and arrested—Hector Villanueva, Annel Abrehante, and Luis Menendez. Villanueva, Abrehante, and Menendez are currently charged in the Indictment, 17 Cr. 481 (WHP).

Based on prior law enforcement surveillance, Hector Villanueva was identified as an associate of Target Subject Adalberto VELAZQUEZ. Specifically, VELAZQUEZ was observed on multiple occasions visiting Auto Body Shop-2, which was a suspected location for packaging and selling large quantities of narcotics.

33

USAO_002027

The DEA and other law enforcement agents will continue to use search warrants in this investigation where appropriate. However, based on my training and experience, and my familiarity with this investigation to date, I believe that additional search warrants are not appropriate at this stage of the investigation. Although the investigation has identified certain locations where the Target Subjects are believed to conduct their narcotics activities, agents do not know all such locations, nor do agents know when these transactions are set to take place. Moreover, execution of a residential search warrant might tip off the Target Subjects as to the existence of the investigation.

**10. Arrests**

As discussed above, on or about May 10, 2018, Hector Villanueva, Annel Abrehante, and Luis Menendez were arrested inside Auto Body Shop-2, and are currently charged in the Indictment, 17 Cr. 481 (WHP). None of the three defendants is currently cooperating with the broader investigation. Moreover, on or about November 12, 2018, Angel MARTINEZ was arrested in possession of suspected heroin that he received from Target Subject VELAZQUEZ on behalf of his mother, Target Subject ANDINO. MARTINEZ was released and is not presently charged with a crime. MARTINEZ is also not currently cooperating with the broader investigation. Even if one of these individuals decides to cooperate, I believe, based on my training, experience, and familiarity with this investigation, that these defendants would not be able to offer information sufficient to accomplish the goals of this investigation. Because DTOs are compartmentalized, and because specific individuals within a DTO often interact with only a very limited number of other DTO members, I do not believe that these sources of information

34

2017.10.30

would be able to provide actionable intelligence that law enforcement could use to thwart the DTO's activities, including its operations in other states and countries.

Furthermore, arresting additional Target Subjects and attempting to obtain their cooperation in investigating the activities of their criminal associates would be premature and counterproductive to the ultimate goals of the investigation at this time. If the Target Subjects were arrested, other co-conspirators would likely be alerted to the existence of the investigation and would take defensive measures that would seriously jeopardize the investigation. These risks of failure in attempting to obtain the Target Subjects' cooperation at this stage of the investigation greatly outweigh any likely benefits, and make this investigative technique unavailable.

### 11. Trash Searches

Trash searches are also not a reasonable alternative to wire surveillance. Although agents have identified locations in the Bronx, New York, where Target Subjects operate, trash searches are not a feasible method of investigation. In the commercial and residential buildings where the Target Subjects reside and operate, trash searches are often not fruitful due to the nature of those buildings (where trash is oftentimes combined with that of other apartments and buildings). Furthermore, based on my training and experience, I know that trash searches as a general matter are not effective in fully identifying the participants and scope of a narcotics trafficking and money laundering conspiracy.

### 12. Prior Wiretaps

As discussed above, in the course of this investigation, this Court issued an order on October 18, 2018 authorizing the interception of communications over the ROMAN Phone, and

35

2017.10.30

an order of November 1, 2018 authorizing the interception of communications over Target Subject-1. Communications intercepted pursuant to the October 18 Order and the November 1 Order have enabled law enforcement agents to discern the cellular phone numbers used by additional Target Subjects and gain some insight into their roles in the DTO's operations. For example, through the October 18 Order, agents confirmed, among other things, that Target Cellphone-1 is used by Adalberto VELAZQUEZ, and that VELAZQUEZ appears to be supplying ROMAN with narcotics. Moreover, through the November 1 Order, agents were able to identify "Tone" as one of VELAZQUEZ's possible suppliers. Agents also learned the identity of several of VELAZQUEZ and ROMAN's customers through interceptions conducted pursuant to the October 18 Order and November 1 Order. These interceptions have been extremely valuable and demonstrate the significant investigative value of the interceptions requested herein.

Thus far, however, the wire interceptions obtained in connection with the October 18 Order and the November 1 Order have not allowed agents to accomplish the goals of this investigation, which include identifying the Target Subjects' sources of supply for controlled substances, all the locations where members of the DTO engage in the Target Offenses, and all the members of the DTO. Because "Tone" appears to be VELAZQUEZ's supplier, and thus appears to be higher within the organizational structure of the DTO, intercepting communications occurring over Target Cellphone-2, while continuing to intercept communications occurring over Target Cellphone-1, will further the investigation, and will allow law enforcement to identify other members of the DTO in this District and the surrounding region, learn where and when these local Target Subjects are working and traveling to commit the Target Offenses (and perform

36

2017.10.30

surveillance of them), gather further evidence of the commission of the Target Offenses, and further discern the routes and methods of narcotics transportation, packaging, and distribution used by the DTO.

## IV.  Ancillary Investigative Orders

I respectfully submit the following additional facts and circumstances in support of the Government's Application for certain ancillary investigative orders necessary to effectuate the purposes of the Order of Interception and the needs of this Investigation.

### A.  Order to Service Provider

#### 1.  Technical Assistance to Accomplish the Interception

Consistent with 18 U.S.C. § 2518(4), to effectuate the Order of Interception, the DEA will require the Service Provider for the Target Cellphones, and any Successor Service Provider for the Target Cellphones, to furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with services to the persons whose communications are to be intercepted, and maintain service to the Target Cellphones for the period of interception and any extensions thereto.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

#### 2.  Pen Register and Trap and Trace Information

The pen register and trap and trace information sought in the Government's Application (incorporated by reference but for the sake of brevity not repeated herein) is needed to identify who is calling, and who is being called from, the Target Cellphones.  This information is relevant to the investigation in this matter, and indeed is essential to assist in achieving the Objectives of the Interception.

37

2017.10.30

USAO_002031

### 3. Geolocation Information and Delayed Notice and Return

Providers of cellular telephone service generally have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service. The most common geolocation information consists of (i) cell-site data, also known as "tower/face information" or cell tower/sector records; and (ii) E-911 Phase II data, also known as GPS data or latitude-longitude data. Cell-site data identifies the cell towers (*i.e.*, antenna towers covering specific geographic areas) that receive a radio signal from the cellular telephone and, in some cases, the sector (*i.e.*, 120° face) of the towers to which the telephone connects. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. In some instances the service provider may send a signal to the cellphone to facilitate or trigger the generation and collection of geolocation information.

I respectfully submit there is probable cause to believe that the location of the Target Cellphones at times determined by investigators during the authorized period of interception, and information regarding the location of the Target Cellphones during the 60 days preceding the date that the order is entered (the "Requested Location Information"), will constitute evidence of the Target Offenses. Prospective (real-time) location information will assist in achieving the Objectives of the Interception by allowing location of, and as appropriate, the surveillance of, the Target Cellphones and their users, at times relevant to the commission of the Target Offenses. As to historical location information, as explained in detail above, "Tone" has used Target Cellphone-

38

2017.10.30

2 to discuss dropping off a sample of narcotics to, and receiving payment for previous deliveries of narcotics from, VELAZQUEZ. There is thus probable cause to believe that the historical location information for the past 60 days will assist in determining where "Tone" has been obtaining his narcotics for purposes of resale.

No physical installation of a tracking device, as discussed in Fed. R. Crim. P. 41(e)(2)(C), will be required; this information will be provided by means available to the Service Provider. But to the extent this request is otherwise deemed to fall within the confines of that rule, it is further requested, pursuant to 18 U.S.C. § 3103a(b) and Rule 41(f)(3), that the Court authorize delay of notice of the acquisition of the geolocation information until 120 days after the date of the Court's order authorizing that acquisition. It is also requested that the return on the warrant for geolocation information under Rule 41(f) be made, by analogy to the requirements for a tracking warrant, within 10 days after acquisition of the geolocation information (including any extensions) has ended, under seal. Delay of notice is justified under 18 U.S.C. § 3103a(b) and Rule 41(f)(3) because, *e.g.,* narcotics traffickers very frequently resort to violence among themselves, against suspected cooperators, and occasionally against investigating officers; and further, if narcotics suspects (certain of whom have ties with other countries) learn they are under investigation, they can easily dispose of evidence and contraband, flee, or go under cover to avoid arrest and prosecution. Certainly if the users of the Target Cellphones learn that geolocation information for the Target Cellphones have been provided to law enforcement authorities, they may be expected to take immediate measures to thwart the investigation.

39

2017.10.30

### 4. Non-Disclosure

For the reasons discussed herein, it is necessary that the Service Provider and any Successor Service Provider and their respective agents and employees not disclose or cause the disclosure of the Order to Service Provider to any person other than those of their agents and employees who require said information to accomplish the interception ordered, and that, in particular, the Service Provider and any Successor Service Provider and their respective agents and employees shall in no event make such disclosure to the telephone user involved, or to any actual or potential interceptee.

### 5. Successor Service Provider

As discussed above, because a cellphone user can change the service provider that provides service to a particular cellphone, it is important, to avoid interruption in the execution of the Order of Interception and ancillary orders requested, that the Order to Service Provider be immediately applicable to any Successor Service Provider without the delay attendant upon obtaining a new order of this court. To effectuate the Order of Interception and ancillary orders requested, it is also necessary for the Service Provider and any Successor Service Provider to inform the DEA immediately if the service provider changes during the course of the Interception Period, or if the information needed to change Service provider, *e.g.*, *IMSI or telephone numbers* for the Target Cellphones are supplied to another service provider.

### B. Order for Expedited Provision of Information Concerning Communications Devices Related to the Interception

During the course of the interception the pen register and trap and trace devices discussed above will indicate, among other things, the identifying numbers (*e.g.*, telephone numbers) of

40

2017.10.30

USAO_002034

telephones and communications devices calling, or being called via, the Target Cellphones. To the extent new numbers surface during the interception it will be essential to obtain as quickly as possible subscriber and service information for those numbers to permit identification of the users of those numbers and pertinent further investigation. This type of information is available under 18 U.S.C. § 2703(d) pursuant to grand jury subpoena, administrative order, and court order or warrant. However, because some service providers do not process grand jury and administrative subpoenas as quickly as these circumstances require, a court order with a 24-hour time limit is necessary to obtain the subscriber and service information sought in the Government's Application (incorporated by reference but for the sake of brevity not repeated herein) in a timely manner. The court order herein sought, which does not specify a particular telephone number or service provider, will only be used for the duration of this interception for telephone numbers calling or being called by the Target Cellphones. Pursuant to 18 U.S.C. § 2705(b), for the same reasons discussed above, it is requested that this order include a direction that the service provider not provide notice to the subscriber or customer as to whom information is provided (i) for six months following the date of this order, (ii) and thereafter, without ten (10) days prior notice to the Investigating Agency in case a further delay in providing notice is warranted..

**V.  Sealing**

It is further requested that to avoid premature disclosure of the investigation, guard against flight of suspects or the loss of evidence, and to better ensure the safety of agents and others, this Application, including the Affidavit and accompanying proposed orders, as well as any Periodic Reports, be sealed and placed in the custody of the United States Attorney's Office for the Southern

41

2017.10.30

District of New York until ordered unsealed by the Court or by another judge of competent

jurisdiction, except that copies of the Order of Interception, Order to Service Provider, and

ancillary orders requested herein may be provided to the DEA and to the Government, and be

served on service providers as may be necessary to effect the order's purpose.

NELSON PABON
Task Force Officer
Drug Enforcement Administration

Sworn to before me this
29th day of November, 2018

THE HONORABLE J. PAUL OETKEN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

42

2017.10.30

USAO_002036